Day, J.
This is an application for a writ of mandamus, against the local school directors and teacher, m a subdistrict of a township, to admit the children of the plaintiff to the privileges of a specific district school. By agreement the case is submitted upon the facts stated in the information and answer, which are substantially as follows :
The plaintiffis'a coloi’ed citizen having three children, and resides in school subdistrict number nine in the township of Norwich, Franklin county, Ohio. There is but one public school in the subdistrict, to which the plaintiff sends' his children for instructions; but the teacher, under the direction of the local directors, wholly neglects and refuses to impart instruction to them, or treat them as scholars, and denies them the educational advantages of the school. There are not twenty colored children in that subdistrict, subject to enumeration for school purposes; but, including the children of the plaintiff, there are more than that number of colored children in subdistrict number nine and the adjoining district of the incorporated village of Hilliard, in the same township. The township board of education has formed a joint district, within the limits of the two districts, for the education of colored children, as provided by law. They have erected a school house, and established a school in the joint district for the education of colored children, which school affords to such children all the advantages and privileges of a common school, equal to those of the school - for white children, in subdistrict number nine. The plain-' tiff and his children reside in the joint district, and are entitled to and have been offered all the advantages and privileges of the joint district school, which, though the school house does not stand within subdistrict number nine, is as convenient and accessible for the children of the plaintiff, as is that in subdistrict number nine to some families of white residents in that subdistrict, and the school house in the joint district is as conveniently situated for the families of colored children in that district as the school house in subdistrict number nine is for the white families of that district. The board of education have appropriated the full *204 share of all funds, on the basis of the enumeration for school purposes in the township belonging to the joint district for -colored children, for the support of such school, which is equal in its advantages and privileges to any common school in the township, and is so sustained each year for a longer period than the schoolfor white children in subdistrict number nine can be maintained. During all the time the plaintiff insisted on having his children instructed in subdistrict ■number nine, in the school established for white childron, an equally good school was open for them in the joint district established for colored children, as provided by law, where they could enjoy the full advantages and privileges of a public common school.
The defendants, in refusing to recognize the children of the plaintiff as pupils in the school of subdistrict number nine, acted in good faith, and without any design of depriving them of a common school education ; but they claim that they may properly insist that the children of the plaintiff shall be educated in the school established for colored -children in the joint district, and that they rightfully refuse them instruction in the school for white children in subdis-trict number nine.
It is quite apparent from this state of the case, that the proceeding is brought, not because the children of the plaintiff are excluded from the public schools, but to test ■the right of those having charge of them to make a classification of scholars on the basis of color. This is the principal question in the case, and we propose to consider it without reference to the question made as to the proper parties to the proceeding, for, in the view we take of the case, this becomes unnecessary.
The system of public education in Ohio is the creature of the constitution and statutory laws of the State. The constitution provides that “ it shall be the duty of the general assembly to pass suitable laws * * * * to encourage schools and the means of instruction.” (Art. 1, sec. 7.) Again, it provides that “ The general assembly shall make •such provision, by taxation or otherwise, as, with the income *205 arising from the school trust fund, will secure a thorough, and efficient system of common schools throughout the State.” (Art. 6, sec. 2.)
It is left to the discretion of the general assembly, in the exercise of the general legislative power conferred upon it, to determine what laws are “suitable” to secure the organization and management of the contemplated system of common schools, without express restriction, except that “no-religious or other sect or sects shall ever have any exclusive right to, or control of, any part of the school funds of the State.” (Art 6, sec. 2.)
Under these powers and requirements of the constitution, the general assembly has attempted to organize, by “ suitable laws,” an “ efficient system of common schools,” for the purpose (as expressed in the 63d section of the act of 1853) “of affording the advantages of a free education to all the-youth of this State.”
Under this system, the territory of each organized township, not included in a city or incorporated village, composes “one school district for all purposes connected with the general interests of education in the township,” and is “ confided to the management and control of aboard of edu cation,” which is composed of the several clerks of each of the boards of local directors elected in the subdistricts into which the townships are divided. The public schools in cities and villages are confided to the management of boards of education elected therein.
It is made the duty of the boards of education to “ prescribe rules and regulations for the government of all the common schools within their jurisdiction.” They are authorized to establish schools for the study of the German language, to establish graded schools, and to classify the children so as to secure to all an equitable participation in the advantages thereof. They are authorized to change and alter the subdistricts, and the number of scholars assigned to each. The boards of education of adjoining townships are authorized to constitute subdistricts out of parts of their townships. Amongst the numerous express powers confer’ *206 red by the statute on boards of education for the regulation of public schools, is that of the 31st section, authorizing the establishment of schools for colored children. The section, as amended in 1864, (S. & S. 705,) is as follows :
“ Sec. 31. The township boards of education in this State, in their respective townships, and the several other boards of education, and the trustees, visitors and directors of schools, or other officers having authority in the premises, of each city or incorporated village, shall be and they are hereby authorized and required to establish, within their respective jurisdictions, one or more separate schools for colored children, when the whole number, by enumeration, exceeds twenty, and when such schools will afford them, as far as practicable, the advantages and privileges of a common school education; and all such schools so established for colored children shall be under the control and management of the board of education, or other school officers who have in charge the educational interests of the other schools ; and such schools for colored children shall be continued in operation each year until the full share of all the school funds of the township or district belonging to said colored children, on the basis of enumeration, shall have been expended ; provided, that when the number of colored children residing in adjoining townships or districts, whether in the same or in different counties, shall exceed twenty, the boards of education of said townships or districts so situated, may form a joint district for the education of colored children, and said school shall be under the control and direction of the board of education of the township or district in which the school house is situated. When the whole number of colored children enumerated is less than twenty, or when, owing to the great distance they reside from each other, a separate school for colored children is impracticable, the board of education shall set apart the full share of school funds raised on the number of said colored children, and the money so set apart shall be appropriated each year for the education of such colored children, under the direction of said board.”
*207 As to the validity of the provisions of this section we express no opinion further than is necessary to the determination of this case, in which it clearly appears that the clauses applicable to it did not operate to exclude the colored children of that locality from a common school education equal to that of the other youth. Were this not the fact, more doubt would arise. But where both classes of children, as in the case before us, enjoy substantially equal advantages in different schools, and the separate school for colored children is clearly authorized by the statute, the only doubt that arises is as to the constitutional validity of the law which authorizes such separation on the basis of color: and that is the real question in this case.
The constitution confers the legislative power of the State upon the general assembly, and “ that includes all legislative power which the object and purposes of the State government may require ; and we must look to other provisions of the constitution to see how far, and to what extent, legislative discretion is qualified or restricted.” (Per Gholson, J. in Baker v. The City of Cincinnati, 11 Ohio St. 542.) The constitution contains no restrictions upon the “ legislative discretion,” in regard to the classification of the youth of the State for school purposes. Those, then, enjoying equal privileges with all, cannot complain of a want of power to regulate the manner in which such privileges shall be enjoyed, for in this, as in all cases, the legislature has the power to regulate, for the general good, the mode in which parties shall enjoy their rights, without coming in conflict with any of those constitutional principles which are established for the protection of private rights.
But the question of legislative power to authorize the classification of the youth of the State for school purposes on the basis of color, has been determined by the supreme court of this State, both under the preseut constitution and that of 1802. The 25th section of the bill of rights in the latter contains express provisions guaranteeing “ equal participation ” to all in the schools endowed, in whole or in part, from the revenue arising from donations made by the United States *208 for the support of schools. But it was held in The State ex rel. &c. v. The City of Cincinnati (19 Ohio, 178,) that, inasmuch as “ the whole subject of organizing and regulating schools is very properly left to the general assembly, in the exercise of its legislative powers,” an act to authorize the establishment of separate schools for the education of colored children was constitutional; and it was said by Hitchcock, C. J., in that case, that, “as a matter of policy, it is unquestionably better that the white and colored youth should be placed in separate schools, and that the school fund should be divided to them in proportion to their numbers.” After this expression of opinion by that eminent judge, we might at least hesitate to conclude, that the classification of the youth of the State for school purposes, on the basis of color, was an unauthorized or unreasonable exercise of the legislative discretion in the regulation of the public schools of the State.
But in Van Camp v. The Board of Education of Logan, (9 Ohio St. 406,) the question under consideration was expressly determined by. this court, upon the original statute, which, so far as material to the question, was the same as-that under which the classification was made in this case. In that case the legislative power of classification on the basis of color was sanctioned, and it was held, that, inasmuch as the statute “is a law of classification and not of exclusion fi colored children “are not, as of right, entitled to admission into the common schools set apart under said act for the instruction of white youths.” The application, however, made in that case, of the principle settled by it, we are-not required to approve or disapprove in this, for in that case there had not been, as there was in this, a separate school established for colored children.
It would seem, then, that under the constitution and laws-of this State, the right to classify the youth of the state for school purposes, on the basis of color, and to assign them to separate schools for education, both upon well recognized legal principles and the repeated adjudications of this court,, is too firmly established to be now judicially disturbed.
*209 But it is claimed that the law authorizing the classifica tion in question contravenes the provisions of the 14th amendment of the constitution of the United States, and is, therefore, abrogated thereby.
The section of the amendment relied upon is as follows ;
“ Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States ; nor shall any State deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.”
Unquestionably all doubts, wheresoever they existed, as to the citizenship of colored persons, and their right to the “ equal protection of the laws,” are settled by this amendment. But neither of these was denied to them in this State before the adoption of the amendment. At all events, the statutes classifying the youth of the State for school purposes on the basis of color, and the decisions of this court in relation thereto, were not at all based on a denial that colored persons were citizens, or that they are entitled to the equal protection of the laws. It would seem, then, that these provisions of the amendment contain nothing conflicting with the statute authorizing the classification in question, nor the decisions heretofore made touching the point in controversy in this case. Nor do we understand that the contrary is claimed by counsel in the case. But the clause relied on, in behalf of the plaintiff, is that which forbids any State to “ make or enforce any law which shall abridge the privileges or immunities of citizens of the United States.”
This involves the enquiry as to what privileges or immunities are embraced in the inhibition of this clause. We are not aware that this has been as yet judicially settled. The language of the clause, however, taken in connection with other provisions of the amendment, and of the constitution of which it forms a part, affords strong reasons for believ *210 ing that it includes only such privileges or immunities as are derived from, or recognized by, the constitution of the United States. A broader interpretation opens into a field of conjecture limitless as the range of speculative theories, and might work such limitations of the power of the States to manage and regulate their local institutions and affairs as were never contemplated by the amendment.
If this construction be correct, the clause has no application to this case, for all the privileges of the school system of this State are derived solely from the constitution and laws of the State. If the general assembly should pass a law repealing all laws creating and regulating the system, it cannot be claimed that the-l4th amendment could be interposed to prevent so grievous an abridgement of the privileges of the citizens of the State, for they would thereby be deprived of privileges derived from the State, and not of privileges derived from the United States.
But we need not now further discuss this point, as the true meaning and exact limits of the clause in question are not necessarily involved in this case. For, conceding that the 14th amendment not only provides equal securities for all, but guarantees equality of rights to the citizens of a State, as one of the privileges of citizens of the United States, it remains to be seen whether this privilege has been abridged in the case before us. The law in question surely does not attempt to deprive colored persons of any rights. On the contrary it recognizes their right, under the constitution of .the State, to equal common school advantages, and secures to them their equal proportion of the school fund. It only regulates the mode and manner in which this right shall be enjoyed by all classes of persons. The regulation of this right arises from the necessity of the case. Undoubtedly it should be done in a manner to promote the best interests of all. „ But this task must, of necessity, be left to the wisdom and discretion of some proper authority. The people have committed it to the general assembly, and the presumption is that it has discharged its duty in accordance with the best interests of all. At all events, the legislative action *211 is conclusive, unless it clearly infringes the provisions of the constitution.
At most, the 14th amendment only affords to colored citizens an additional guaranty of equality of rights to that already secured by the constitution of the State.
The question, therefore, under consideration is the same that has, as we have seen, been heretofore determined in this State, that a classification of the youth of the State for school purposes, upon any basis which doos not exclude either class from equal school advantages, is no infringement of the equal rights of citizens secured by the constitution of the State.
We have seen that the law, in the case before us, works no substantial inequality of school privileges between the children of both classes in the locality of the parties. Under the lawful regulation of equal .educational privileges, the children of each class are required to attend the school provided for them, and to which they are assigned by those having the lawful official control of all. The plaintiff', then, cannot claim that his privileges are abridged on the ground of inequality of school advantages for his children. Nor can he dictate where his children shall be instructed, or what teacher shall perform that office, without obtaining privileges not enjoyed by white citizens. Equalty of rights does not involve the necessity of educating white and colored persons in the same school, any more than it does that of educating children of both sexes in the same school, or that different grades of scholars must be kept in the same school. Any classification which preserves substantially equal school advantages is not prohibited by either the State or federal constitution, nor would it contravene the provisions of either. There is, then, no ground upon which the plaintiff can claim that his rights under the fourteenth amendment have been infringed.
The action of the defendants was warranted by the authority conferred by the general assembly in the exercise of its constitutional powers. “ Where the power which is exercised is legislative in its character, the courts can enforce *212 only those limitations which the constitution imposes, and not those implied restrictions, which, resting on theory only, the people have been satisfied to leave to the judgment, patriotism, and sense of justice of their representatives.” Cooley’s Con. Lim. [*129].
Mandamus refused.
Welch, C. J., and White, McIlvaine and West, JJ., concurred. N